***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Harris and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. The Full Commission adopts the Opinion and Award of Deputy Commissioner Harris with minor modifications.
 *********** ISSUES
1. Whether plaintiff sustained a compensable injury by accident on March 5, 2002?
2. If so, to what compensation, if any, is plaintiff entitled?
3. Whether plaintiff is entitled to attorney's fees under N.C. Gen. Stat. § 97-88.1?
 *********** *Page 2 
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. An employer-employee relationship existed between plaintiff and defendant as of March 5, 2002.
2. The date of the contested injury is March 5, 2002.
3. Plaintiff's claim was denied pursuant to a Form 61 on March 23, 2004, after plaintiff filed a Form 18 on February 17, 2004 and a Form 18B on March 2, 2004.
 *********** EXHIBITS
The following documents were accepted into evidence as stipulated exhibits:
 • Exhibit 1: Executed Pre-Trial Agreement
 • Exhibit 2: Parties' discovery responses
 • Exhibit 3: Plaintiff's medical records
 • Exhibit 4: Form 22
 • Exhibit 5: Report of Douglas Bryon
 • Exhibit 6: Industrial Commission Forms
Transcripts of the depositions of the following were also received post-hearing:
 • Jeffrey A. Katz, P.A.
 • Dr. Ahmed I. Elnaggar
 • Dr. Ashley Henderson
 • Douglas Bryon
 *********** *Page 3 
Based upon all the competent evidence from the record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. Plaintiff is 56 years old, with a date of birth of March 3, 1952. He has a tenth grade education. He began working for defendant-employer in 1973 and worked there for about two years. He resumed working for defendant in 1982 and was employed there continuously until his resignation on January 1, 2005.
2. Plaintiff was a crane operator for defendant in defendant's plant in Conover, North Carolina. The plant manufactured flexible polyurethane foam products, such as styrofoam and mattress components.
3. On the evening of March 5, 2002, a fire broke out in the plant. The fire started due to a chemical reaction in some hot styrofoam. Plaintiff and a co-worker, Jackie Dillon, undertook to put the fire out and remove the foam safely from the plant. Plaintiff had no protective gear to wear as he fought the fire.
4. Plaintiff fought the fire for about thirty minutes. For nearly the entire time, plaintiff was inside the building hosing down the burning material. While plaintiff fought the fire, he continuously inhaled black acrid smoke and fumes from the burning foam and experienced burning in his lungs, tightness in his chest, and pain in his back. Plaintiff's eyes burned, and he had the sensation of his breath being taken away.
5. Plaintiff had difficulty breathing immediately after the fire was contained. He was dizzy and nauseous, and he coughed up some black material. A supervisor observed plaintiff to be "hacking pretty good." *Page 4 
6. That night, plaintiff and Jackie Dillon were treated for smoke inhalation in the emergency room at Catawba Memorial Hospital. While at the emergency room, plaintiff developed pain under his shoulder blades, like knives sticking in his back.
7. Over the next few months, plaintiff's acute symptoms abated, but he continued to have shortness of breath and coughing.
8. Plaintiff was fifty years old when he experienced this smoke and fume inhalation. Other than some childhood asthma, he had not had lung or breathing problems before March 5, 2002. Besides smoking as a teenager, plaintiff was not a smoker.
9. After his emergency room treatment on the night of the fire, plaintiff next treated for his symptoms with Jeffrey Katz, P.A. Mr. Katz understood that this was a work-related matter and deferred further treatment recommendations to Dr. Allen Edwards with Hart Industrial Clinic.
10. On April 16, 2002, plaintiff saw Dr. Edwards who noted that plaintiff's symptoms and pulmonary functioning suggested mild reactive airway disease.
11. On May 8, 2002, Dr. Edwards recommended that plaintiff be re-evaluated by his personal physician and noted that he had no work restrictions.
12. On May 9, 2002 and May 30, 2002, plaintiff saw Mr. Katz with a persistent cough and pain in his lungs. Mr. Katz referred plaintiff to a pulmonologist.
13. Plaintiff later came under the care of Dr. Elnaggar, a board-certified pulmonologist. Dr. Elnaggar first saw plaintiff on September 2, 2003. On that date, plaintiff reported that he had experienced shortness of breath, severe at times, since the March 5, 2002 exposure. *Page 5 
14. Dr. Elnaggar treated plaintiff over the course of the next three years, last seeing him on July 19, 2006. Dr. Elnaggar ultimately diagnosed plaintiff with reactive airways dysfunction syndrome (RADS).
15. Dr. Elnaggar arrived at the RADS diagnosis based on plaintiff's history, blood work, bronchoscopy with CT scans, and a methacholine challenge test done on November 17, 2006 that showed bronchial hyperactivity. Dr. Elnaggar also excluded other possible conditions such as lupus, cancer, and allergic asthma.
16. Plaintiff's ongoing symptoms of shortness of breath, fatigue, coughing, and wheezing were consistent with RADS.
17. Dr. Elnaggar testified that RADS usually arises from a single acute exposure incident. Dr. Elnaggar further testified that given that plaintiff was exposed to urethane smoke and fumes and high heat in the March 5, 2002 fire incident that the incident caused plaintiff's RADS.
18. Dr. Elnaggar advised plaintiff that he should stay out of work until he had a firm diagnosis.
19. Plaintiff continued working for defendant until he simply could not catch his breath. When he worked, plaintiff had difficulty with coughing, and the smell of the plant seemed to bother him.
20. Plaintiff went out of work on short-term disability in or about June of 2004. The short-term disability plan was fully funded by defendant-employer. Dr. Elnaggar completed a physician's certification form on June 3, 2004 stating that plaintiff could not work because of his symptoms of pain in the back of his lungs, shortness of breath, and heart pain. Dr. Elnaggar wrote that the diagnosis at that time was smoke inhalation. *Page 6 
21. After being on short-term disability for six months, plaintiff resigned from his employment with defendant-employer effective December 31, 2004.
22. On February 10, 2005, because he still had not arrived at a firm diagnosis for plaintiff, Dr. Elnaggar wrote that plaintiff was not able to work at that time due to plaintiff's lung disease. The duration and return to work were unknown at that time.
23. On March 1, 2005, Dr. Elnaggar wrote that plaintiff suffers from pulmonary fibrosis, shortness of breath, and frequent lung infections. Dr. Elnaggar also noted that plaintiff was not able to work at that time due to his conditions.
24. Based on the weakly positive results of the methacholine challenge test, Dr. Elnagger characterized plaintiff's RADS as not severe. Dr. Elnaggar testified that RADS could resolve spontaneously, or it could remain for the rest of plaintiff's life.
25. As of Dr. Elnaggar's deposition on October 10, 2007, he had not seen plaintiff for nearly fifteen (15) months. He had no opinion on plaintiff's ability to work at that time. Dr. Elnaggar indicated that if plaintiff had significant lung impairment, he would be totally disabled from working, but Dr. Elnaggar was unable to determine whether that was the case at the time of his deposition. Dr. Elnaggar testified that in any event plaintiff should not work in any environment containing fumes or other breathing irritants. During the hearing before the Full Commisson, the undersigned allowed into evidence an evaluation dated May 22, 2008 and a note dated June 8, 2008 by Dr. Elnaggar indicating that plaintiff is unable to work and has been since June 3, 2004 in any capacity for the foreseeable future due to his current pulmonary condition.
26. Dr. Ashley Henderson, a pulmonologist at UNC Hospital, saw plaintiff once on February 2, 2006 to run some diagnostic tests. Dr. Henderson ran a spirometry test, the results of which showed that plaintiff had reactive airways. Dr. Henderson ran a methacholine challenge *Page 7 
test later in the day, but she threw out the results as invalid because she believed that plaintiff was still under the influence of the albuterol that he had inhaled as part of the earlier spirometry test. Dr. Henderson diagnosed plaintiff with asthma, but not specifically RADS.
27. Dr. Henderson agreed that, assuming plaintiff had normal lung function before his March 5, 2002 exposure, and given the results of her testing and the November 17, 2006 methacholine challenge test, Dr. Elnaggar's RADS diagnosis was appropriate.
28. Dr. Henderson testified that she would not recommend that plaintiff work in any environment similar to that in which he worked with defendant-employer.
29. Mr. Katz testified that he did not delve into the causation of any lung problems plaintiff was having.
30. To the extent, if any, that the testimony of Mr. Katz and Dr. Henderson contradicts that of Dr. Elnaggar on the issues of causation and disability, the Full Commission gives greater weight to the testimony of Dr. Elnaggar because of his expertise and the length of his treatment of plaintiff.
31. Defendants contend that plaintiff has relied on exposure to toluene diisocyanate (TDI) during the fire as a precipitating factor for his development of RADS. TDI is a chemical agent used in the polyurethane manufacturing process, and it is extremely hazardous to breath TDI fumes. Defendants further contend that plaintiff was not exposed to TDI, in that they contend that any TDI used at the Conover plant is spent during the foam reacting process and is thus not present in the type of manufactured styrofoam that burned during the fire. Defendants further contend that Dr. Henderson and/or Dr. Elnaggar erroneously relied on TDI exposure in arriving at their diagnoses. However, it is clear from Dr. Elnaggar's testimony that he did not rely specifically on TDI exposure in formulating his diagnosis; rather, his diagnosis was based *Page 8 
on the results of diagnostic testing, the exclusion of other possible diagnoses, and plaintiff's inhalation of urethane smoke and exposure to high heat on March 5, 2002.
32. Plaintiff's treatment for RADS is similar to that for asthma, with inhaled bronchodilators and steroids and avoidance of irritating substances and environments.
33. The treatment that Dr. Elnaggar and the other providers have provided to plaintiff has been reasonably required to effect a cure and/or provide relief for plaintiff's respiratory condition. Further treatment with Dr. Elnaggar is reasonably required to effect a cure, provide relief, or lessen plaintiff's period of disability.
34. As of the hearing before the deputy commissioner, plaintiff was still suffering from sporadic coughing and shortness of breath.
35. Based on the Form 22, plaintiff's average weekly wage is $471.26, and his compensation rate is $314.19.
 ***********
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff has shown that he sustained an injury by accident to his lungs arising out of and in the course of his employment with defendant-employer on March 5, 2002. To the extent that plaintiff's condition may be characterized as a disease, plaintiff has shown that his respiratory condition, RADS, resulted naturally and unavoidably from the March 5, 2002 accident. As such, plaintiff's RADS is compensable under N.C. Gen. Stat. § 97-2(6).
2. Plaintiff has shown that he is totally disabled from employment and has been since June 3, 2004. As such, plaintiff is entitled to ongoing temporary total disability *Page 9 
compensation beginning June 3, 2004 and continuing until further Order of the Commission. N.C. Gen. Stat. § 97-29.
3. Defendants are entitled to a full credit for short-term disability compensation paid to plaintiff. N.C. Gen. Stat. § 97-42.
4. Plaintiff is entitled to have defendants pay for the medical treatment he has received for his compensable respiratory condition. Plaintiff is also entitled to receive further treatment with Dr. Elnagger for his compensable respiratory condition that is reasonably required to effect a cure, provide relief, or lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
5. Defendants have not defended this claim without reasonable grounds. As such, plaintiff is not entitled to attorney's fees under N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fee provision below, defendants SHALL pay ongoing temporary total disability compensation to plaintiff in the amount of $314.19 per week beginning from June 3, 2004 and continuing until further order of the Commission. Defendants may take a full credit, out of this amount in the total amount of short-term disability compensation paid to plaintiff. Any temporary total disability benefits that have accrued shall be paid to plaintiff in one lump sum subject to an attorney's fee provided below. *Page 10 
2. As plaintiff's attorney's fee, out of the post-credit amount figured per Paragraph 1 above, defendants SHALL pay twenty-five percent (25%) of said post-credit amount directly to plaintiff's counsel. This fee shall be paid out of the amount due plaintiff and not in addition to it.
3. Dr. Elnaggar is hereby designated as plaintiff's treating physician, and defendants SHALL authorize and pay for the treatment that Dr. Elnaggar recommends for plaintiff's compensable respiratory condition, including but not limited to diagnostic testing, surgery, prescriptions, therapy, referrals, and mileage.
4. Defendants SHALL pay for the medical treatment that plaintiff has received for his compensable respiratory condition, including but not limited to the treatment, diagnostic testing, and prescriptions at the direction of Mr. Katz, Dr. Edwards, Dr. Elnaggar, and Dr. Henderson. If plaintiff and/or any third-party payor has paid for any such treatment, defendants SHALL reimburse said payor in full.
5. Defendants shall pay the costs. As part of their costs, if they have not done so already, defendants shall pay an expert witness fee to each of the following providers, in the amount shown or the amount billed, whichever is less: $215.00 to Mr. Katz; $415.00 to Dr. Elnaggar; $415.00 to Dr. Henderson, and; $200.00 to Mr. Bryon.
This the 22nd day of September 2008.
S/___________________ BUCK LATTIMORE COMMISSIONER
 CONCURRING: *Page 11 
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER
 S/___________________ PAMELA T. YOUNG CHAIR *Page 1